UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

TROY L. LYLE,

      Defendant.

_____ /

Case No. 23-20098

F. Kay Behm
United States District Judge

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (ECF No. 28)

This matter is before the court on Defendant Troy L. Lyle's motion to suppress. (ECF No. 28). On May 3, 2023, Defendant was charged in a Superseding Indictment with one count of possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(e). (ECF No. 15). On December 12, 2023, Defendant filed the present motion, arguing that the evidence uncovered during the relevant traffic stop should be suppressed based on violations of his Fourth Amendment rights. (ECF No. 28, PageID.86). The court granted Defendant's request for an evidentiary hearing, which was held on February 20, 2024. (*See* ECF No. 30). After the hearing, the court allowed Defendant to file a supplemental brief, "within two weeks of receiving [the] hearing transcript." (*See* Minute Entry, February 20, 2024). The transcript of the

evidentiary hearing was filed on March 22, 2024, (ECF No. 45), but Defendant

chose not to file a supplemental brief.  The Government filed a supplemental brief

on April 19, 2024.  (ECF No. 50).  Considering the parties' arguments and the

evidence presented at the hearing, the court now **DENIES** Defendant's motion to

suppress.

## I.    FACTUAL BACKGROUND

The parties largely agree on the facts underlying this case.  On January 23,

2023, at approximately 2:18 am, two Michigan State Police (MSP) officers,

Sergeant Jared Chiros and Trooper Frashaun Darrough, stopped a 2021 Chevrolet

Malibu with Illinois plates that was traveling approximately 43 MPH in a 35 MPH

speed zone.  (ECF No. 45, PageID.159) ("Q. [] And this night, what was the basis

for the defendant's – the traffic stop in this case? A. Speed.")).  The traffic stop

occurred on Clio Road in Flint, Michigan.  *Id*.  It was snowing at the time of the

stop, and the officers noted that some snow had accumulated on the road.  *Id.*,

PageID.163 ("Q. I want to also ask you about the road conditions. Can you – taking

a look at the camera, do you remember what the conditions were around that

night? A. Snowy.").  The entire interaction was captured on Trooper Darrough and

Sergeant Chiros' body-worn cameras.  *Id.*, PageID.161.  Both videos were

admitted as exhibits at the February 20, 2024 evidentiary hearing.  *Id.*,

PageID.161, 166; *see also* Exhibit 1; Exhibit 2.  The court also heard testimony

from Trooper Darrough at the evidentiary hearing, but not Sergeant Chiros.[1]  (*See*

ECF No. 45).

Immediately after pulling over Defendant's vehicle,[2] the officers observed

Defendant making movements that appeared to be focused on or near the

underside of the driver's seat.  (Exhibit A at 0:06-0:08, Frashaun Darrough's Body-

Worn Camera Video); (ECF No. 45, PageID.162) ("Q. [] What did you mean to say

to [Sergeant] Chiros when you said "he's moving, tucking? A. Furtive movements

being observed.").  Sergeant Chiros first approached Defendant's window and

introduced himself, to which Defendant responded, unprompted, that he was

"picking up his phone."  (Exhibit A at 0:14-0:18) (Chiros: "Oh, you were just

picking up your phone?"); (*see also* ECF No. 45, PageID.166) ("Q. [] were you in a

position to hear [Sergeant] Chiros introduce himself to Mr. Lyle during this stop?

A. Yes, sir. Q. And were you also able to hear Mr. Lyle respond that he was picking

up his phone? A. Yes, sir.").  Sergeant Chiros asked Defendant for his license and

---

[1] Sergeant Chiros was no longer employed with the Michigan State Police at the time of the hearing, and the Government chose not to subpoena him for testimony.  (ECF No. 45, PageID.204) ("Trooper Chiros is not available as a witness to the Government because he's no longer employed in law enforcement. So he's not available unless we subpoena him, and we have not chosen to do that.").

[2] Defendant admits he was driving a rental vehicle at the time of the traffic stop.  (ECF No. 28, PageID.81) ("Lyle also mentioned that he was driving a rental vehicle.").

informed him that he was driving 43 MPH in a 35 MPH zone.  (Exhibit A at 0:21-

0:30) (Chiros: "You got your license on you? Do you know what the speed limit is

through here? You were doing 43, it's a 35…did you know it was a 35?"); (*see also*

ECF No. 45, PageID.167) ("Q. [] And at this point, were you able to hear [Sergeant]

Chiros advise [Defendant] he was going 43 in a 35 miles an hour zone? A. Yes,

sir.").  Sergeant Chiros asked Defendant about the status of the rental vehicle,

whether he had insurance, whether he rented the vehicle himself, and whether

he could produce the rental agreement.  (Exhibit A at 0:40-0:55) (Chiros: "Rental

car, so you're probably not used to driving it then, Mr. Lyle? You got, uh, did you

get the insurance on the car? For the rental company? You got the rental

agreement? Did you rent it, or did somebody else?").  Sergeant Chiros then asked

Defendant if he had any guns in the vehicle "for protection."  (Exhibit A at 1:00);

(*see also* ECF No. 45, PageID.168) ("Q. Did you hear [Sergeant] Chiros ask the

defendant – or Mr. Lyle if he carries guns for protection? A. Yes.).  Defendant

responded "no."  (Exhibit A at 1:01).

Approximately one minute and eight seconds into the traffic stop, Sergeant

Chiros asked Defendant to step out of the vehicle for the first time.  (Exhibit A at

1:08) (Chiros: "Can you hop out and just come talk to me back here real quick?

Behind the car, rather than in the middle of Clio road.").  Defendant refused.

4

(Exhibit A at 1:09).  Sergeant Chiros then ordered Defendant to step out of the

vehicle.  (Exhibit A at 1:18) (Chiros: "Well, I'm going to tell you you're going to hop

out.").  Sergeant Chiros reiterated his request after Defendant again refused,

stating that Defendant was being ordered out of the car "for safety reasons."

(Exhibit A at 1:19-1:28) (Chiros: "When we [inaudible] the car, you were kind of

reaching around under the seat, you say it was your phone right? Okay. YOU say

that, but I don't know right? For safety reasons I'm going to have you hop out,

ok?").  Defendant again refused.  (Exhibit A at 1:34-2:37) (Defendant: "I don't

want to get out of my car…that's the law.").

Approximately two minutes and 38 seconds into the stop, Sergeant Chiros

advised Defendant that he could be arrested for resisting and obstructing if he

continued to refuse to get out of the vehicle.  (Exhibit A at 2:38) (Chiros: "You're

about to go to jail for a felony. Is that what you want to do?"); (*see also* ECF No.

45, PageID.169) ("Q. [] And what part of resisting and obstructing – what is he

doing that would be illegal? A. Refusing to get out of the car.").  Both Sergeant

Chiros and Trooper Darrough continued to argue with Defendant for

approximately nine minutes and 30 seconds, emphasizing that they could not run

his name through their computer system until he stepped out of the vehicle.

(Exhibit A at 3:04-3:09) (Chiros: "You realize we could already have been back

there and run your name? I don't want to do this in the middle of Clio Road.").

Finally, Trooper Chiros opened the door and Defendant voluntarily stepped out of

the vehicle.  (Exhibit A at 9:30); (*see also* ECF No. 45, PageID.175) ("Q. [] At about

9:30 seconds in…did you see Mr. Lyle exit the vehicle? A. Yes.").

   Once Defendant was out of the vehicle, Sergeant Chiros asked if he could

pat him down.  (Exhibit A at 9:33-9:40) (Chiros: "No weapons on you, right? Face

the car. No weapons on you Mr. Lyle? Is it ok if we pat you down?").  Defendant

refused.  (Exhibit A at 9:39) ("I don't want you touching me."); (*see also* ECF No.

45, PageID.177) ("Q. And did you hear [Sergeant] Chiros ask if he can pat him

down? A. Yes. Q. And how did Mr. Lyle respond? A. He said he didn't want him to

touch him.").  Sergeant Chiros remarked that there were "no bulges" in

Defendant's pockets.  (Exhibit A at 9:41) (Chiros: "I can actually see that you have

no bulges.").  The officers performed a limited sweep of Defendant's car, focusing

under the front seat and in the center console, but did not find any contraband.

(Exhibit A at 10:08-10:20).

   Sergeant Chiros then returned to the police car and used the computer

system to run a query of Defendant's license and registration, which returned

three Friend of the Court (FOC) warrants, including at least one felony.  (Exhibit A

at 11:26) (Chiros: "He's got FOC warrants.").  Sergeant Chiros asked Trooper

Darrough to place Defendant in handcuffs.  (Exhibit A at 12:26-12:29) (Chiros: "Will you cuff him? He's got the three warrants."); (*see also* ECF No. 45, PageID.180) ("Q. What does [Sergeant] Chiros ask you at this point? We're now at 12:29. A. Asking me to place Mr. Lyle in handcuffs.").  Approximately 12 minutes and 50 seconds into the traffic stop, Trooper Darrough handcuffed Defendant and placed him in the back of the police car, at which point he was under arrest for the outstanding warrants.  (Exhibit A at 12:40-14:46).  Once Defendant was secured in the back seat, Sergeant Chiros radioed for Louie's, a towing service. (ECF No. 45, PageID.182) ("Q. And what is that a reference to? A. Louie's Towing. Q. Why would he be radioing Louie's? A. The vehicle is being impounded subject to arrest.").  Trooper Chiros also searched Defendant's person pursuant to arrest and discovered a pistol in the pocket of his jacket, which was then placed on the front hood of the police car.  (Exhibit A at 17:04); (*see also* ECF No. 45, PageID.184 ("Q. What did [Sergeant] Chiros find? A. A firearm.").  This firearm forms the basis of the charge against Defendant in the First Superseding Indictment.  (*See* ECF No. 15).

## II.   ANALYSIS

The key question currently before the court is whether the firearm uncovered following the traffic stop of Defendant's vehicle must be suppressed

based on a "distinct violation of [Defendant's] Fourth Amendment rights." (ECF

No. 28, PageID.86). Defendant argues that, while the traffic stop was reasonable

at its inception because it was "prompted by the observation of a traffic law

violation," it was "improperly extended beyond completing tasks tied to the initial

infraction." *Id.* Specifically, Defendant argues the officers "extended the duration

of the stop by requesting that [he] exit the vehicle, and by making inquiring [sic]

about the presence of firearms," which constituted an overreach of their

authority. *Id.*, PageID.87. The Government disagrees, arguing the officers acted

reasonably at all times and did not unreasonably prolong the stop. (ECF No. 29,

PageID.90).

        The Fourth Amendment protects "[t]he right of people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and

seizures…" U.S. Const. Amend. IV. An ordinary traffic stop by the police is

considered a "seizure" within the meaning of the Fourth Amendment. *United

States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The tolerable duration of a

traffic stop "is determined by the seizure's 'mission,' which is to address the

traffic violation that warranted the stop [] and to attend to related safety

concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Illinois v.

Caballes*, 543 U.S. 405, 407 (2005)). This typically includes "checking the driver's

8

license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 349. In *Rodriguez v. United States*, the Supreme Court specifically addressed the constitutionality of extended traffic stops. 575 U.S. 348 (2015). *Rodriguez* involved a traffic stop where the officer had "completed his mission" by issuing a written warning for a traffic infraction, but still made the defendant get out of his vehicle and wait seven or eight additional minutes while the officer conducted a dog sniff of the defendant's car. *Id.* at 352. The dog sniff uncovered a large bag of methamphetamine, which formed the basis of the defendant's charges. *Id.* The Court acknowledged that traffic stops are "especially fraught with danger to police officers" and, therefore, officers "may need to take certain negligibly burdensome precautions in order to complete [their] mission safely." *Id.* at 356 (citing *Arizona v. Johnson*, 555 U.S. 323, 330 (2009); *United States v. Holt*, 264 F.3d 1215, 1221-22 (10th Cir. 2001)). However, the Court emphasized that any precautions related to officer safety must be limited and must not unreasonably prolong the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355.

In this case, unlike *Rodriguez*, the officers never issued Defendant a ticket for the traffic violation. A vast majority of the traffic stop, which lasted

approximately thirteen minutes, was instead spent arguing with Defendant and

repeatedly ordering him to get out of his car.  This was directly tied to the

potential danger associated with the traffic stop itself, including the fact that the

officers previously observed Defendant making "furtive movements" and that the

car was currently stopped on the side of a busy road.  *See Pennsylvania v. Mimms*,

434 U.S. 106, 111 (1977) ("The hazard of accidental injury from passing traffic to

an officer standing on the driver's side of the vehicle may also be appreciable in

some situations…the officer prudently may ask the driver of the vehicle to step

out of the car and off onto the shoulder of the road where the inquiry may be

pursued with greater safety to both.").  The officers continually reiterated that

they were asking Defendant to get out of the car "for safety reasons" only, not

based on any desire to investigate other potential crimes.  (*See* Exhibit A at 3:07

(Chiros: "I don't want to do this in the middle of Clio Road"); 3:12 (Chiros: "If

there is something in [the car] and I don't know what that is, I just want you back

there."); 5:07 (Chiros: "I just want you separated from the vehicle for safety

reasons, that's all. And I don't want to do this in the middle of Clio Road"); 6:45

(Chiros: "For safety reasons, we're asking you to hop out of the car")).  Defendant

argues the troopers "rushed to behave in a manner that extended the duration of

the stop by requesting that Lyle exit the vehicle, and by making inquiring [sic]

about the presence of firearms." (ECF No. 28, PageID.87). However, it has been long recognized that officers have a legal right to order an individual to get out of their vehicle during a traffic stop as an important component of officer safety. *Mimms*, 434 U.S. at 111 n.6 ("We hold [] that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). Additionally, inquiring about the presence of firearms is rooted strictly in the interest of officer safety and does not, on its face, transform the stop into an "exploratory search for additional criminal activity." (ECF No. 28, PageID.88); *see also United States v. Patterson*, No. 22-CR-20269, 2023 WL 4290051, at *7 (E.D. Mich. June 30, 2023) (citing *Johnson*, 555 U.S. at 327).

While the officers spent eight minutes negotiating with Lyle and ordering him to step out of the car, this did not prolong the stop beyond the time reasonably required to "address the traffic violation" and "attend to related safety concerns." *Rodriguez*, 575 U.S. at 354; *see also United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) (21 minutes was not an unreasonable time to complete the traffic stop under the circumstances). This is evident when comparing the facts of this case to the facts of cases where courts in this District

have found that a traffic stop was unlawfully prolonged.  *See United States v. Gordon*, No. CR 17-20781, 2018 WL 2843277, at *8 (E.D. Mich. June 11, 2018) (nearly 30 minutes of investigation into whether the driver was generally "up to no good" was unreasonable); *United States v. Mahone*, 179 F. Supp. 3d 760, 762 (E.D. Mich. 2016) ("officers did not search the vehicle until after any permissible justification to search had dissipated. The officers had decided to not even write Defendant a traffic ticket. Yet, the officers continued his detention – seized him, handcuffed him, and placed him in a police car on a hunch – lacking reasonable suspicion.").  Here, Sergeant Chiros and Trooper Darrough lawfully stopped Defendant for driving 43 MPH in a 35 MPH zone, they asked Defendant to step out of the vehicle within a minute and a half of first making contact, and they were not able to complete any other portion of the traffic stop's "mission" until Defendant complied.  Once Defendant was out of the car, they quickly continued the "mission" of the traffic stop by running Defendant's information through their computer system and discovered he had active warrants, leading to his eventual arrest.  The approximately eight-minute delay in the traffic stop to remove Defendant from his car did not unlawfully divert from the overall purpose of the traffic stop.  As such, the officers' actions were in compliance with the Fourth Amendment and the evidence uncovered should not be suppressed.

III.   **CONCLUSION**

For the reasons stated above, Defendant's motion to suppress is **DENIED.**

**SO ORDERED**.

Date: May 7, 2024                    <u>s/F. Kay Behm</u>
                                     F. Kay Behm
                                     United States District Judge